IN THE SUPREME COURT OF NORTH CAROLINA

 2022-NCSC-3

 No. 59A21

 Filed 11 February 2022

 IN THE MATTER OF C.C.G.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1)–(2) from orders entered on

 3 April 2020 by Judge Jeanie Houston and on 16 November 2020 by Judge David V.

 Byrd in District Court, Ashe County. This matter was calendared for argument in the

 Supreme Court on 22 December 2021 but determined on the record and briefs

 without oral argument pursuant to Rule 30(f) of the North Carolina Rules of

 Appellate Procedure.

 Grier J. Hurley for petitioner-appellee Ashe County Department of Social
 Services.

 Paul W. Freeman Jr. for appellee Guardian ad Litem.

 Wendy C. Sotolongo, Parent Defender, by Jacky Brammer, Assistant Parent
 Defender, for respondent-appellant mother.

 BARRINGER, Justice.

¶1 Respondent appeals from the trial court’s order terminating her parental

 rights to her daughter C.C.G. (Carrie)1 and from the trial court’s earlier

 permanency-planning order which eliminated reunification from Carrie’s permanent

 1 A pseudonym is used in this opinion to protect the juvenile’s identity and for ease of

 reading.
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 plan. See N.C.G.S. § 7B-1001(a1) (2019). Respondent has not challenged on appeal

 the trial court’s conclusions that grounds existed to terminate her parental rights or

 that termination was in Carrie’s best interests. Instead, respondent argues the trial

 court erred by denying her motion to continue the termination hearing, by failing to

 comply with the requirements of the Indian Child Welfare Act (ICWA), and by

 eliminating respondent’s visitation with Carrie in a permanency-planning order.

 After careful review, we find no reversible error.

 I. Factual and Procedural Background

¶2 On 15 March 2019, the Ashe County Department of Social Services (DSS) filed

 a petition alleging that Carrie was a neglected juvenile. The petition alleged that

 respondent had a long history with DSS dating back to 2006 due to issues of domestic

 violence, substance abuse, mental health difficulties, and improper supervision and

 that DSS recently became involved with the family when it received a report in

 December 2018 alleging substance abuse, medical neglect, and improper care and

 supervision.

¶3 In an order entered 3 May 2019, the trial court adjudicated Carrie to be a

 neglected juvenile. The trial court agreed with DSS’s recommendation that it was in

 Carrie’s best interests to continue Carrie in respondent’s custody with conditions that

 respondent comply with her Family Service Case Plan and that Carrie attend school

 regularly and without tardiness.
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

¶4 On 13 May 2019, DSS filed a motion for review due to respondent’s

 noncompliance with both the adjudication order and her Family Service Case Plan.

 DSS alleged that Carrie continued to have unexcused absences and tardies from

 school. DSS also alleged that respondent had not complied with her Family Services

 Case Plan in that she did not attend the scheduled assessment for Carrie at Youth

 Villages; had not consistently attended her substance abuse sessions at Daymark;

 had a positive drug screen; and had been arrested for possession of schedule IV

 substances, schedule II substances, marijuana, and methamphetamine.

¶5 Following a review hearing on 15 May 2019, the trial court entered an order

 on 28 June 2019 granting DSS nonsecure custody of Carrie with placement in DSS’s

 discretion. Respondent was granted a minimum of two hours of supervised visitation

 twice per month. The trial court concluded that the best primary plan of care for

 Carrie was reunification with a secondary plan of guardianship with an approved

 caregiver.

¶6 Pursuant to N.C.G.S. § 7B-906.1(a), the trial court conducted regular

 permanency-planning hearings. After the permanency hearing on 14 February 2020,

 the trial court concluded that supervised visitation between respondent and Carrie

 was not in Carrie’s best interest and inconsistent with her health and safety.

 Therefore, the trial court suspended visitation and contact between respondent and
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 Carrie. Further, the trial court changed the permanent plan to adoption with a

 secondary plan of custody or guardianship with an approved caregiver.

¶7 On 2 June 2020, DSS filed a petition to terminate respondent’s parental rights

 alleging grounds for termination pursuant to N.C.G.S. § 7B-1111(a)(1)–(3), (6). When

 respondent did not appear at the termination hearing on 16 October 2020,

 respondent’s counsel made an oral motion to continue. The trial court denied the

 motion to continue. Following the hearing and presentation of evidence, the trial

 court entered an order concluding that grounds existed to terminate respondent’s

 parental rights pursuant to N.C.G.S. § 7B-1111(a)(1)–(3) and that it was in Carrie’s

 best interests that respondent’s parental rights be terminated. Accordingly, the trial

 court terminated respondent’s parental rights. Respondent appealed.

 II. Analysis

 A. Motion to Continue

¶8 “[A] denial of a motion to continue is only grounds for a new [termination-of-

 parental-rights hearing] when [the respondent] shows both that the denial was

 erroneous, and that he [or she] suffered prejudice as a result of the error.” In re A.L.S.,

 374 N.C. 515, 517 (2020) (quoting State v. Walls, 342 N.C. 1, 24–25 (1995)). Unless

 the motion to continue raises a constitutional issue, “a motion to continue is

 addressed to the discretion of the trial court.” Id. at 516–17 (quoting Walls, 342 N.C.

 at 24). Therefore, to show error on a motion to continue that does not raise a
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 constitutional issue, the respondent must show that the trial court abused its

 discretion. Id. at 517. “Abuse of discretion results where the [trial] court’s ruling is

 manifestly unsupported by reason or is so arbitrary that it could not have been the

 result of a reasoned decision.” Id. at 517 (quoting State v. Hennis, 323 N.C. 279, 285

 (1988)).

¶9 In this matter, respondent has not advanced a constitutional argument before

 the trial court or this Court. Instead, respondent asserts that the trial court abused

 its discretion because there was no evidence she received notice of the hearing, a

 guardian ad litem had been appointed for her, the trial court was deprived of her

 testimony, and the trial court had previously allowed continuances.

¶ 10 Based on the record before us, respondent has failed to show an abuse of

 discretion by the trial court. “[C]ontinuances are not favored and the party seeking a

 continuance has the burden of showing sufficient grounds for it.” In re J.E., 377 N.C.

 285, 2021-NCSC-47, ¶ 15 (quoting In re S.M., 375 N.C. 673, 680 (2020)).

 “Continuances that extend beyond 90 days after the initial petition shall be granted

 only in extraordinary circumstances when necessary for the proper administration of

 justice.” N.C.G.S. § 7B-1109(d) (2021).

¶ 11 In this matter, the record reflects that the notice of hearing was sent to

 respondent’s counsel and respondent’s guardian ad litem. Both respondent’s counsel

 and respondent’s guardian ad litem were present at the termination-of-parental-
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 rights hearing. Neither tendered an affidavit or evidence in support of the motion to

 continue. Instead, they made unsworn statements in support of the motion to

 continue. Neither argued that respondent intended to testify, that the preexisting

 appointment of a guardian ad litem entitled respondent to a continuance, or that the

 previously allowed continuances justified allowance of this continuance.

 Respondent’s counsel and respondent’s guardian ad litem instead represented that

 they believed respondent was aware of the hearing date and had made efforts to

 contact her but had not spoken to respondent. However, they had corresponded about

 the hearing date with respondent’s mother, who had respondent’s contact information

 and often provided a home for respondent.

¶ 12 After hearing from respondent’s counsel and guardian ad litem, the trial court

 asked DSS’s counsel if DSS had spoken to respondent. DSS’s counsel replied that the

 social worker had spoken to her last week. The social worker then informed the trial

 court that she had spoken with respondent twice the week prior and that respondent

 “knows when the court date is.” The social worker explained that respondent knew

 that the court date was today as she had spoken to respondent last week about the

 date and respondent was upset that the hearing was on her birthday.

¶ 13 Given the representations to the trial court and the record before us, we cannot

 conclude that the trial court’s denial of the motion to continue was manifestly

 unsupported by reason or arbitrary. The burden falls to the party seeking the
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 continuance to show sufficient grounds for granting the motion. In re J.E., ¶ 15. It

 does not shift to another party or the trial court. See id. Thus, in the context of this

 case, where among other things the moving party has only offered unsworn

 statements and argument, we find no error by the trial court. See State v. Beck, 346

 N.C. 750, 756–57 (1997) (finding trial court did not err by denying motion to continue

 where unsworn statements of defendant’s trial counsel were not sufficient to justify

 delaying the trial).

¶ 14 Respondent has also failed to show any prejudice arising from the trial court’s

 denial of her motion to continue. Respondent argues she was materially prejudiced

 because her testimony was a vital source of information regarding the nature of the

 parent/child relationship and integral to any consideration of her parental rights.

 However, when making the oral motion, respondent’s counsel neither indicated

 respondent intended to testify nor provided an affidavit or offer of proof of

 respondent’s potential testimony. Thus, as in other cases the Court has decided

 recently, there is nothing before this Court to show that respondent would have

 testified and that such testimony would have impacted the outcome of the proceeding.

 See, e.g., In re D.J., 378 N.C. 565, 2021-NCSC-105, ¶ 14; In re H.A.J., 377 N.C. 43,

 2021-NCSC-26, ¶ 13; In re A.L.S., 374 N.C. at 518. Therefore, we hold that the trial

 court did not err by denying the request for a continuance.
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 B. Indian Child Welfare Act

¶ 15 Respondent argues the trial court failed to comply with its duties under the

 ICWA because the trial court had reason to know that Carrie was an Indian child.

 DSS and the guardian ad litem for Carrie (GAL) disagree, arguing that respondent

 conflates the existence of or possibility of a distant relation with an Indian with

 reason to know that a child is an Indian child.

¶ 16 Paragraph (c) of 25 C.F.R. § 23.107 specifies when a trial court has reason to

 know a child is an Indian child. It states:

 (c) A court, upon conducting the inquiry required in
 paragraph (a) of this section, has reason to know that a
 child involved in an emergency or child-custody proceeding
 is an Indian child if:
 (1) Any participant in the proceeding, officer of the
 court involved in the proceeding, Indian Tribe, Indian
 organization, or agency informs the court that the child is
 an Indian child;
 (2) Any participant in the proceeding, officer of the
 court involved in the proceeding, Indian Tribe, Indian
 organization, or agency informs the court that it has
 discovered information indicating that the child is an
 Indian child;
 (3) The child who is the subject of the proceeding gives
 the court reason to know he or she is an Indian child;
 (4) The court is informed that the domicile or
 residence of the child, the child’s parent, or the child’s
 Indian custodian is on a reservation or in an Alaska Native
 village;
 (5) The court is informed that the child is or has been
 a ward of a Tribal court; or
 (6) The court is informed that either parent or the
 child possesses an identification card indicating
 membership in an Indian Tribe.
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 25 C.F.R. § 23.107(c) (2020).

¶ 17 “Indian child” is defined as “any unmarried person who is under age eighteen

 and is either (a) a member of an Indian tribe or (b) is eligible for membership in an

 Indian tribe and is the biological child of a member of an Indian tribe.” 25 U.S.C.

 § 1903(4) (emphasis added). Thus, as we have previously explained,

 “The inquiry into whether a child is an ‘Indian child’
 under ICWA is focused on only two circumstances: (1)
 Whether the child is a citizen of a Tribe; or (2) whether the
 child’s parent is a citizen of the Tribe and the child is also
 eligible for citizenship.” Indian Child Welfare Act
 Proceedings; Final Rule, 81 Fed. Reg. at 38,804. The
 inquiry “is not based on the race of the child, but rather
 indications that the child and her parent(s) may have a
 political affiliation with a Tribe [as defined in 25 U.S.C.
 § 1903].” Indian Child Welfare Act Proceedings; Final Rule,
 81 Fed. Reg. at 38,806; see also Indian Child Welfare Act
 Proceedings; Final Rule, 81 Fed. Reg. at 38,801 (“ ‘Indian
 child’ is defined based on the child’s political affiliation
 with a federally recognized Indian Tribe.”).

 In re M.L.B., 377 N.C. 335, 2021-NCSC-51, ¶ 16 (alteration in original).

¶ 18 Here, respondent relies on three documents in the record to support her

 argument that there is reason to know Carrie is an Indian child. First, respondent

 relies on a DSS court report reflecting an answer of “no” to the inquiry whether there

 is “any information to indicate that [Carrie] may be subject to the [ICWA]” and

 explaining, “[respondent] reported there is [a] possible distant Cherokee relation on

 her mother’s side of the family.” Second, respondent relies on an in-home family
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 services agreement stating, “[respondent] reports Cherokee Indian Heritage.” Third,

 respondent relies on another DSS court report reflecting an answer of “no” to the

 inquiry whether there is “any information to indicate that [Carrie] may be subject to

 the [ICWA]” and explaining, “[respondent] reported there is [a] possible distant

 Cherokee relation on her mother’s side of the family but no further specifics are

 known.”

¶ 19 None of these documents state Carrie is an “Indian child” and none contain

 information indicating that Carrie or her biological parents are members or citizens

 of an Indian tribe.2 See 25 C.F.R. § 23.107(c)(1)–(2). Indian heritage, which is racial,

 cultural, or hereditary does not indicate Indian tribe membership, which is political.

 See 25 U.S.C. § 1903(4); In re M.L.B., ¶ 16. Thus, these statements do not provide

 reason to know that Carrie is an Indian child under 25 C.F.R. § 23.107(c).

¶ 20 However, respondent also contends the trial court erred by not asking at the

 termination-of-parental-rights hearing whether the participants had reason to know

 if Carrie was an Indian child.

¶ 21 Subsection 23.107(a) of Title 25 of the Code of Federal Regulations provides

 that “State courts must ask each participant in an emergency or voluntary or

 2 At the termination-of-parental-rights hearing, the social worker also testified that

 there was no information that Carrie is a member of an Indian tribe and that there were no
 reports from family members that Carrie was possibly an Indian child. Therefore, there was
 no reason on the basis of the information that was available to the trial court at the time of
 the termination hearing for the trial court to know that Carrie was an Indian child.
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 involuntary child-custody proceeding whether the participant knows or has reason to

 know that the child is an Indian child” and that “[such] inquiry is made at the

 commencement of the proceeding and all responses should be on the record.”

¶ 22 Child-custody proceeding is defined as follows:

 Child-custody proceeding. (1) “Child-custody
 proceeding” means and includes any action, other than an
 emergency proceeding, that may culminate in one of the
 following outcomes:
 (i) Foster-care placement, which is any action
 removing an Indian child from his or her parent or Indian
 custodian for temporary placement in a foster home or
 institution or the home of a guardian or conservator where
 the parent or Indian custodian cannot have the child
 returned upon demand, but where parental rights have not
 been terminated;
 (ii) Termination of parental rights, which is any action
 resulting in the termination of the parent-child
 relationship;
 (iii) Preadoptive placement, which is the temporary
 placement of an Indian child in a foster home or institution
 after the termination of parental rights, but prior to or in
 lieu of adoptive placement; or
 (iv) Adoptive placement, which is the permanent
 placement of an Indian child for adoption, including any
 action resulting in a final decree of adoption.
 (2) An action that may culminate in one of these four
 outcomes is considered a separate child-custody proceeding
 from an action that may culminate in a different one of
 these four outcomes. There may be several child-custody
 proceedings involving any given Indian child. Within each
 child-custody proceeding, there may be several hearings.

 25 C.F.R. § 23.2 (2020) (last emphasis added).
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

¶ 23 The trial court’s orders in the trial court’s adjudication and disposition order

 entered on 3 May 2019 and order transferring custody to DSS entered on

 28 June 2019 both specifically state “[t]he [c]ourt inquired of the parties and none of

 the parties know or have reason to know the child is an Indian child as defined at 25

 U.S.C. [§] 1902(4); 25 C.F.R. [§] 23.2.” Thus, the record3 before us reflects that the

 trial court made the inquiry required by 25 C.F.R. § 23.107(a) at the hearing

 addressing and ultimately resulting in the removal of Carrie from respondent and

 rendering respondent without the right to have Carrie returned upon demand.

 However, the record does not reflect that the trial court made the inquiry required by

 25 C.F.R. § 23.107(a) at a hearing after DSS moved for termination of the parent-

 child relationship. Nevertheless, as the determination of whether there is reason to

 know that Carrie is an Indian child can be made on the record and as discussed

 previously there is no reason to know that Carrie is an Indian child, we conclude that

 there is no reversible error. See In re A.L., 378 N.C. 396, 2021-NCSC-92, ¶ 28

 (remanding the case to the trial court because the determination of whether there is

 reason to know the juvenile is an Indian child could not be made on the record).

 3 While respondent disputes the determination by the trial court that there is neither

 information that Carrie is an “Indian child” or reason to know that Carrie is an “Indian child,”
 respondent does not dispute and does not offer any record support contrary to the trial court’s
 finding that it inquired of the parties whether they had reason to know that Carrie is an
 “Indian child” at hearings prior to the termination-of-parental-rights hearing.
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 C. Visitation

¶ 24 Respondent asks this Court to reverse the 3 April 2020 permanency-planning

 order which eliminated reunification from Carrie’s permanent plan because the

 determination to cease visitation was either legal error or abuse of discretion.

¶ 25 In cases arising under the juvenile code, “to obtain relief on appeal, an

 appellant must not only show error, but that the error was material and prejudicial,

 amounting to denial of a substantial right that will likely affect the outcome of an

 action.” In re L.E.W., 375 N.C. 124, 128 (2020) (cleaned up). To show error by the trial

 court concerning visitation in a permanency-planning order which eliminated

 reunification, we review for an abuse of discretion “with an abuse of discretion having

 occurred only upon a showing that the trial court’s actions are manifestly

 unsupported by reason.” In re L.E.W., 375 N.C. at 134 (cleaned up). We also “review

 the order eliminating reunification together with an appeal of the order terminating

 parental rights.” N.C.G.S. § 7B-1001(a2).

 1. Challenge to reconsideration of visitation plan

¶ 26 According to respondent, the determination to cease visitation was legal error

 or abuse of discretion because the trial court at the February 2020 hearing had

 “substantially the same” information and facts before it that the trial court had at the

 22 November 2019 hearing, where it found visitation was still in Carrie’s best

 interests. However, respondent concedes that additional information was in the DSS
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 court report and that the GAL court report and a social worker provided new

 testimony. In other words, the trial court received new information at the February

 2020 hearing. Pursuant to N.C.G.S. § 7B-906.1(d)(2), at review and

 permanency-planning hearings, the trial court shall consider “whether there is a need

 to create, modify, or enforce an appropriate visitation plan in accordance with

 [N.C.]G.S. [§] 7B-905.1.” N.C.G.S. § 7B-906.1(d)(2) (2021). As N.C.G.S. § 7B-

 906.1(d)(2) instructs the trial court to consider the visitation plan and the trial court

 received new information, we find no merit in respondent’s argument.

 2. Challenge to findings of fact 18 and 34

¶ 27 Respondent also challenges findings of fact 18 and 34, arguing that the social

 worker’s testimony that supports these findings was not reliable. The trial court

 found in findings of fact 18 and 34 that:

 18. [Carrie] had behavioral setbacks until September
 2019. Since she has not seen [respondent] and is in the
 group home [Carrie] has made improvements. Prior to
 September 2019 [Carrie] had superficial self-harming
 behaviors and was aggressive with her peers. She has
 attended a day treatment program as referred through
 Youth Villages and is in therapy. [Carrie] has asked about
 [respondent] one time since September 2019.

 ....

 34. Supervised visitation with [respondent] at this time
 is not in [Carrie’s] best interest and is not consistent with
 her health and safety.
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

¶ 28 We review the trial court’s challenged findings of fact in a

 permanency-planning order that ceases reunification to determine whether they are

 supported by the evidence received before the trial court. In re L.M.T., 367 N.C. 165,

 168 (2013).4 At a review or permanency-planning hearing, “[t]he [trial] court may

 consider any evidence, including hearsay evidence as defined in [N.C.]G.S. [§] 8C-1,

 Rule 801, or testimony or evidence from any person that is not a party, that the [trial]

 court finds to be relevant, reliable, and necessary to determine the needs of the

 juvenile and the most appropriate disposition.” N.C.G.S. § 7B-906.1(c). Appellate

 courts may not reweigh the underlying evidence presented at Subchapter I of the

 Juvenile Code hearings. See, e.g., In re J.A.M., 372 N.C. 1, 11 (2019). It is the role of

 the trial court in these matters to assess the reliability of the testimony and make a

 credibility determination. See id.

¶ 29 DSS and the GAL contend that the two challenged findings of fact are

 supported by the social worker’s unobjected-to testimony. We agree. The social

 4 In past cases, we have used the term “competent evidence” when describing the

 standard of review applicable to the findings of fact in a permanency-planning order. See,
 e.g., In re L.M.T., 367 N.C. 165, 168 (2013). In some contexts, competent evidence means
 admissible evidence pursuant to the rules of evidence. See Evidence, Black’s Law Dictionary
 (11th ed. 2019). However, N.C.G.S. § 7B-906.1(c) makes clear that the evidence that the trial
 court receives and considers in a review or permanency-planning hearing need not be
 admissible under the North Carolina Rules of Evidence. Further, our precedent and Rules of
 Appellate Procedure dictate when we can review the admissibility of evidence admitted by
 the trial court. Accordingly, for clarity, we are avoiding the phrase “competent evidence” in
 the context of permanency-planning orders in favor of using the language the statute itself
 employs: “evidence.”
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 worker testified at the hearing that respondent’s last visit with Carrie was

 6 September 2019, that Carrie had some substantial behavior setbacks “up until

 about September,” including self-harming and aggressive behaviors with some of her

 peers, and that “she just really turned it around,” including improving her grade in

 math, ceasing talking like a baby, and being more compliant. The social worker

 testified that Youth Villages recommended day treatment, which was not available

 at her current placement. Thus, DSS transferred Carrie to a new placement in August

 with what they described as “an amazing program.” The social worker further

 testified that she believed there was a correlation between Carrie’s improvement in

 behavior and her not having seen respondent since September. The social worker

 explained that Carrie wanted to be adopted and asked about respondent only once

 since September. The social worker testified that she thinks it would be detrimental

 to have respondent visiting and contacting Carrie. Since the foregoing testimony from

 the social worker supports findings of fact 18 and 34, they are conclusive on appeal.

 We, therefore, reject respondent’s challenge to findings of fact 18 and 34.

 3. Challenge to cessation of visitation

¶ 30 We next address respondent’s challenge to the trial court’s determination to

 cease visitation. Visitation shall be provided “that is in the best interests of the

 juvenile consistent with the juvenile’s health and safety, including no visitation.”

 N.C.G.S. § 7B-905.1(a) (2021). In this matter, we are bound to challenged findings of
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 fact 18 and 34, which are supported by the evidence before the trial court, and the

 unchallenged findings of fact from the 3 April 2020 permanency-planning order and

 the termination-of-parental-rights order.

¶ 31 Pursuant to the binding findings, “[u]pon entering foster care, [Carrie]

 exhibited behaviors such as walking on her tippy toes, talking in a baby voice, being

 noncompliant and throwing tantrums as well as self-harming behaviors.” Carrie

 received medical evaluations and was diagnosed with post-traumatic stress disorder.

 Carrie was a teenager at the time. “During the period of time [Carrie] did not have

 contact with her [respondent,] these behaviors would improve.” “When visits or

 contact with [respondent] occurred, [Carrie’s] behaviors would regress.” Carrie

 desired to be adopted and did not see her mother as part of her future.

¶ 32 Respondent only attended six visits with Carrie, and she “appeared at a visit

 impaired, fell asleep at a visit, made false promises to [Carrie,] and told [Carrie] to

 not comply with Ashe County DSS.” Respondent’s calls with Carrie were at times not

 appropriate and sometimes involved intensely questioning Carrie, making irrational

 comments, or giving Carrie false hope. Respondent continued to have positive drug

 screens, refused some drug screenings, did not attend a referred parenting class, and

 never completed her psychological evaluation. Respondent also absconded from the

 facility at which she was required to undergo treatment as a condition of her

 probation and refused to meet with the social worker in January 2020. Given the
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 foregoing findings of fact, we are unable to say that the trial court abused its

 discretion by ceasing visitation with Carrie.

 4. Challenge to finding of reasonable efforts by DSS

¶ 33 In the alternative, respondent argues that DSS failed to provide reasonable

 efforts to implement the child’s permanent plan by not providing respondent with any

 visits with Carrie between late September 2019 and February 2020. Respondent

 contends that “because visitation is an essential part of reunification, there can be no

 reasonable efforts toward reunification or preventing foster care when DSS is not

 providing visitation with the child’s mother, even though it is still in the child’s best

 interests.” We disagree.

¶ 34 Subsections 7B-906.1(e)(5) and 7B-906.2(c) direct the trial courts to consider

 and make written findings of fact regarding whether the county department of social

 services has exercised reasonable efforts since the initial permanency plan hearing

 to implement the permanent plan for the juvenile. The juvenile code defines

 “reasonable efforts” as

 The diligent use of preventive or reunification services by
 a department of social services when a juvenile’s remaining
 at home or returning home is consistent with achieving a
 safe, permanent home for the juvenile within a reasonable
 period of time. If a court of competent jurisdiction
 determines that the juvenile is not to be returned home,
 then reasonable efforts means the diligent and timely use
 of permanency planning services by a department of social
 services to develop and implement a permanent plan for
 the juvenile.
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 N.C.G.S. § 7B-101(18) (2021).

¶ 35 Respondent thus challenges the trial court’s determination “[t]hat Ashe

 County DSS has made reasonable efforts to finalize the permanent plan to timely

 achieve permanence for the juvenile and eliminate placement in foster care, reunify

 this family, and implement a permanent plan for the child.”5 The trial court’s other

 findings and the DSS report incorporated by reference into its order support this

 determination. The trial court found that reunification efforts were made to finalize

 permanency, including contacting respondent, attempting to contact respondent,

 maintaining contact with Carrie and the placement providers, and facilitating an

 updated psychological evaluation for Carrie. The social worker also went to meet

 respondent in jail in January 2020 to discuss her family service agreement.

 Respondent, however, refused to meet with her. The DSS report further shows that,

 among other things, DSS had coordinated supervised visits between respondent and

 Carrie prior to late September 2019, scheduled a supervised visitation in late

 September that respondent cancelled, offered to provide respondent transportation

 assistance that respondent rejected, held Child and Family Team Meetings, and

 made multiple attempts to meet with and contact respondent, through phone calls

 5 Respondent also challenges the trial court’s finding that respondent “has not
 provided emotional support for [Carrie]” and “[v]isitation and contact is detrimental to
 [Carrie].” This finding is supported by the testimony of the social worker as previously
 summarized.
 IN RE C.C.G.

 2022-NCSC-3

 Opinion of the Court

 and home and jail visits. Collectively, these findings show that DSS was diligently

 using and providing preventive or reunification services. N.C.G.S. § 7B-101(18).

 Therefore, respondent’s argument is overruled.

¶ 36 Having considered respondent’s arguments, we conclude that respondent has

 not shown any error by the trial court in ceasing respondent’s visitation. Respondent

 also has not shown that even if an error occurred, such error was material and

 prejudicial. See In re L.E.W., 375 N.C. at 128. Accordingly, we affirm the 3 April 2020

 permanency-planning order eliminating reunification from the permanent plan.

 III. Conclusion

¶ 37 For the reasons set forth above, we affirm the 3 April 2020

 permanency-planning order eliminating reunification as a permanent plan and the

 16 November 2020 termination-of-parental-rights order.

 AFFIRMED.